IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KERNELL WILLIAMS,                          *

    Plaintiff                              *

        v.                            *        Civil Action No. DKC-19-1677

WARDEN FRANK B.  BISHOP,                    *
ACTING LT.  DAVID BARNHART,
RICHARD RODERICK, Correctional Case        *
Management Manager, JASON McMAHAN,
Correctional Case Management Specialist II *

    Defendants                             *
                      ***

## MEMORANDUM OPINION

Pending and ready for resolution is a motion to dismiss or in the alternative for summary judgment filed by Defendants Warden Frank B. Bishop, Lieutenant David Barnhart, Richard Roderick, Correctional Case Management Manager, and Jason McMahan, Correctional Case Management Specialist II.  The issues have been briefed, and the court now rules, no hearing is necessary.  Local Rule 105.6.  For the following reasons, Defendants' motion will be granted.

I.     **Background**

    A.     **Allegations in the Verified Complaint[1]**

Plaintiff Kernell Williams arrived at North Branch Correctional Institution ("NBCI") on September 13, 2011, as a Maximum Security Level I inmate, and was placed on a disciplinary segregation tier to finish serving a disciplinary segregation sentence imposed at another

---

[1]   "[A] verified complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge."  *Williams v. Griffin,* 952 F.2d 820, 823 (4th Cir.1991)(quoting *Davis v. Zahradnick*, 600 F.2d 458, 459-60 (4th Cir. 1979).  With his opposition, Plaintiff provided the declaration of a fellow inmate.  Plaintiff did not provide his own declaration with his opposition.

correctional facility.  After he completed the disciplinary sentence in 2012, he was placed in the Behavioral Management Program[2] and assigned to Housing Unit ("HU") #2, B-Tier, as a Maximum Security Level I inmate.  Complaint, ECF No. 1 at 4.

On June 1, 2016, there was a fight among the inmates on the tier.  Plaintiff maintains that he was not involved in the fighting.  He was not questioned by the responding officers or charged with an infraction for participating in the disturbance.  *Id.* at 4.  Defendants acknowledge there is no evidence that Plaintiff participated in that fight, which involved the use of homemade weapons and resulted in life threatening injury to two inmates.  Declaration of David Barnhart, ECF No. 13-4 at 2 ¶ 7; ECF No. 13-7 at 6 (photographs of weapons).

Correctional officers searched Plaintiff's cell on June 2, 2016, where they discovered that a piece of metal was missing from his footlocker, but they were unable to determine whether the metal was missing before Plaintiff was assigned to the cell.  Barnhart Decl., ECF No. 13-4 at 2 ¶¶ 7, 8.

Lt. Barnhart recommended placing Plaintiff on administrative segregation and increasing his security classification to Maximum Security Level II.  Correctional Case Management Manager Roderick approved administrative segregation for Plaintiff.  Lt. Barnhart wrote a memorandum to Case Manager Jason McMahan, recommending an "out-of-cycle security" review

---

[2]   Inmates in the Behavioral Management Program (BMP) at the time were permitted to continue working toward completion of the program.  No additional inmates were assigned to the BMP at NBCI after Maximum Level II Structured Housing was introduced in March 2014.  The initial Max II Structured Housing Directive, DOC.100.0004, was created in December 2015, and was revised effective on July 1, 2017, at which time NBCI inmates began to be assigned to Maximum II Structured Housing.  *See* ECF No. 13-15, Facility Directive DOC.100.0004, revised, titled: "Maximum Security II - Structured Housing." ECF No. 13-1, at 2 n. 1; *see also* ECF No. 13-27 at 53-54 (Information Bulletin, ID #02-14, Maximum Security Level II, NBCI, effective March 5, 2014.)

for Plaintiff.  McMahan performed the security review on July 6, 2016, recommended the security level increase, and Mr. Roderick approved the decision.  ECF No. 1 at 5-6.

In this Complaint filed pursuant to 42 U.S.C. § 1983, Plaintiff alleges that:  (1) Lt. Barnhart's recommendations in his memorandum sought an arbitrary out of cycle review and override of the point system in violation of his constitutional rights;[3] (2) Case Manager McMahan arbitrarily held an "out-of-cycle" security review and raised his security level with wanton disregard to his constitutional rights; (3) Defendants arbitrarily placed him on administrative segregation in violation of his right to substantive due process; (4) Defendants made false statements and falsified documents to place him on administrative segregation indefinitely in violation of his right to due process and in violation of DCD 50-2; (5) his placement on administrative segregation and increase in security level subjects him to an atypical and significant hardship; and (6) he is not provided monthly segregation review which violates his right to procedural due process.  *Id*. at 6-7.  Plaintiff seeks compensatory and punitive damages and declaratory relief.  *Id.* at 7.

### B.    Defendants' Exhibits and Declarations

Defendants' verified exhibits and declarations provide the following information. Institutional records and other information obtained through NBCI Intelligence (INTEL) investigations show that Plaintiff is a known affiliate of the Black Guerilla Family ("BGF"), a Security Threat Group ("STG").  Barnhart Decl., ECF No. 13-4 at 1 ¶ 6.  Plaintiff has a documented history of possessing and manufacturing homemade weapons, tampering with institutional security

---

[3]    Plaintiff does not specify what constitutional rights were allegedly abridged.  In his opposition he states that Defendants' actions violated his right to equal protection under the Fourteenth Amendment.  ECF No. 19 at 4.

equipment, assaulting staff and inmates, and making threats. *Id; see also* ECF No. 13-5 at 1-4 (printout of Plaintiff's rule violations); ECF No. 13-6 (categories of rule violations).

Following a fight among multiple inmates on Plaintiff's tier on June 1, 2016, Lt. Barnhart asked Richard Roderick, then assigned as NBCI's Acting Chief of Security, about assigning Plaintiff to administrative segregation, which Roderick approved. Declaration of Richard Roderick, ECF No. 13-22 at ¶ 4; Barnhart Decl. ECF No. 13-4 at ¶ 7. Plaintiff was placed in administrative segregation pending investigation. ECF No. 13-10 (Notice of Assignment to Administrative Segregation). Plaintiff's cell was inspected on June 2, 2016, and a large piece of metal was determined to be missing from the footlocker. Barnhart Decl. ECF No. 13-4 at ¶ 7.

Lt. Barnhart placed Plaintiff on administrative segregation because he believed him to be a threat to institutional safety and security "due to his history of manufacturing weapons, and the recent increase in the number of homemade weapons being discovered in the institution made from similar material." Barnhart Decl. ECF No. 13-4 at 2 ¶ 8; Declaration of Jason McMahan, ECF No. 13-13 at ¶¶ 4, 5; ECF No. 13-7 at 6 (photographs of two weapons found after June 1, 2016 fight) ECF No. 13-9 (footlocker photographs).[4]

On June 6, 2016, a three-member case management team, which included Case Manager McMahan, conducted Plaintiff's initial administrative segregation placement review and agreed with Lt. Barnhart's recommendation to assign Plaintiff to administrative segregation. Plaintiff attended the review, was advised of the team's recommendation and given the opportunity to respond. McMahan Decl. ECF No. 13-13 at 1-2 ¶ 6; *see also* ECF No. 13-14 at 3-4 (DOC Manual,

---

[4] The photographs also show a piece of cardboard covering the area where the metal was missing. ECF No. 13-1 at 5.

DOC 100.0002, Case Management, Special Confinement Housing); ECF No. 13-19 at 6 (confidential case notes). [5]

On June 7, 2016, Acting Assistant Warden Richard Roderick approved the team's recommendation to place Plaintiff on administrative segregation. McMahan Decl. ECF No. 13-13 at 2 ¶ 7; Roderick Decl. ECF No. 13-22 at 1 ¶ 5. Plaintiff received subsequent monthly reviews of his administrative segregation placement. Plaintiff was given the opportunity to attend each review, except for the reviews occurring on November 15, 2017, and December 12, 2018, because the prison was on lockdown on those two dates. McMahan Decl. ECF No. 13-13 at 2 at ¶ 8; *see also* ECF No. 13-19 at 1-6 (confidential case notes). Plaintiff chose not to attend several reviews. McMahan Decl. ECF No. 13-13 at 2 at ¶ 8; Roderick Decl. ECF No. 13-22 at 1-2 ¶ 6; ECF No. 13-19 at 1-3; ECF No. 19-1 at 4-9.[6]

On June 20, 2017, Case Manager J.G. Sindy wrote to Case Manager Carvette Henson-Smith that Plaintiff was being recommended for Maximum II Structure Housing when available. Sindy recommended Plaintiff remain on administrative segregation for the safety and security of the institution. ECF No. 13-23 at 1. Sindy advised that Plaintiff is a "validated and active member of the BGF." *Id.* On June 27, 2017, Lt. Barnhart wrote a memorandum to Mr. Roderick, noting that over the past five years Plaintiff had four guilty findings for possession of homemade weapons and his adjustment history includes nine additional weapons possession charges, staff assault,

---

[5]    The notes of the review include the statement that "[i]nmate was involved in HU #2 multiple person fight. Intell is investigation" [sic]. ECF No. 13-19 at 6.

[6]    Plaintiff provides with his opposition to Defendants' dispositive motion copies of Waiver and Notification of Case Management Action forms he signed waiving appearances at the November 14, 2018. January 9, 2019, March 6, 2019, and May 1, 2019, segregation review meetings. ECF No. 19-1 at 6-9. He has also filed notices dated June 6, 2016, July 6, 2016, and July 27, 2016, that do not bear his signature or a signature of a correctional staff member. *Id.* at 3-6.

multiple inmate assaults, use of threatening language, and multiple charges for tampering with security equipment.  *Id.* at 2.  Lt. Barnhart further advised that a large number of homemade weapons had been found at NBCI many made of the same metal as the metal discovered missing from Plaintiff's locker, and it was "strongly suspected that [Plaintiff] removed the metal for this purpose."  *Id.*  Lt. Barnhart recommended that Plaintiff remain on administrative segregation and be placed in the Max II Structured Housing Program.  *Id.* at 2.

On July 1, 2016, Lt. Barnhart sent a memorandum to Mr. Roderick to recommend increasing Plaintiff's security level to Maximum II to monitor his activities as closely as possible. Barnhart Decl. ECF No. 13-4 at 2 ¶ 9.  Lt. Barnhart's memorandum stated in part:

> Inmate Kernell Williams, #214-884 is a validated member of the Security Threat Group (STG) the Black Guerilla Family (BGF) currently serving 74 years for three counts of Larceny, 2nd Degree Murder, Handgun Violation, Robbery with a Deadly Weapon, Obstruction of Justice, Assault 1st Degree, Possession of a Deadly Weapon and Smuggling Prison Contraband.  In addition to his original sentence of 50 years, Williams received 23 years for the 1st Degree Assault and Possession of a Deadly Weapon charges for an inmate assault which occurred at ECI [Eastern Correctional Institution] on 11/17/08. Williams also received an additional year for the Smuggling of Prison Contraband charge at R[oxbury] C[orrectional] I[nstitution] on 5/6/11.
>
> During the past five years of inmate Williams' incarceration he has had four guilty findings for possession of homemade weapons.  Williams also participated in a multiple inmate fight at RCI [Roxbury Correctional Institution] in July of 2011 and was found guilty of that infraction.

ECF No. 13-11 at 1.  Further in the memorandum Barnhart explained that during the June 2, 2016, cell search a piece of metal approximately 13" square and 1/8" thick was discovered missing from the footlocker.  Plaintiff received no adjustment ticket because it could not be determined if the metal was missing prior to Plaintiff's assignment to the cell, however,

> [d]ue to inmate Williams' past history of weapons manufacturing and possession, it is strongly suspected that he removed the metal for this purpose.  Since June 1, 2016, six homemade weapons have been found in various 2 B-Wing cells or in the possession of inmates who reside on the wing.

*******

> Inmate Williams has shown that he is a violent inmate who has the ability to obtain the materials needed to produce homemade weapons and the skill set to turn these materials into deadly weapons.   Therefore, the NCBI Intelligence Office recommends that inmate Williams's security level be increased to Maximum Security II in order to house inmate Williams as safely as possible for the overall safety and security of NBCI staff and inmates.

*Id.* at 1-2.

Department of Public Safety and Correctional Services ("DPSCS") Information Bulletin (effective March 5, 2014) set forth various criteria to use in determining suitability for Maximum Level II security designation, including a serious assault on staff or inmate within the past five years or "verified behavior detrimental to the operation or security of a DPSCS facility to include STG activity within the past five years."  ECF No. 13-27 at 53.  It required that recommendations for Maximum Level II status be submitted to the case management supervisor and the Warden or Warden's designee for approval, and the inmate be notified of the final outcome of the review, with yearly security reviews to be held.  *Id*. at 53-54.[7]  Plaintiff  was determined to meet the criteria for Maximum Level II placement.  Barnhart Decl. ECF No. 13-4 at 2 ¶ 9; *see also* ECF No. 13-12 Institutional Bulletin #02-14, Maximum Level II-North Branch Correctional Institution); ECF No. 13-27 at 53-54 (Institutional Bulletin #02-14).

---

[7]    The current Maximum Security II Structure Housing (MAX II SH) directive defines a MAX II SH inmate as an individual who (1) "demonstrates or is known to demonstrate dangerous, violent, or other characteristics that pose serious threat to life, property, self, staff, other inmates, or facility security," (2) is determined to need "enhanced supervision" to "remediate dangerous violent, or other characteristics that pose serious threat to life, property, self, staff, other inmates, or facility security," and (3) would pose serious threat to life, property, self, staff, other inmates, or facility security if housed in the general prison population.  ECF No. 13-15 at 2 (Facility Directive Number: DOC.100.0004).
.

7

On July 6, 2016, Case Manager McMahan prepared a Security Reclassification Instrument ("SRI") that agreed with the recommendation to increase Plaintiff from Maximum Security Level I to Maximum Security II.  ECF No. 13-21 at 2. (SRI).  Before starting the SRI, McMahan reviewed NBCI Institutional Bulletin #02-14, Maximum Level II-NBCI, which provides the guidelines for classifying inmates to Maximum II security.  McMahan Decl. ECF No. 13-13 ¶ 10. Plaintiff scored six on the SRI.  ECF No. 13-21 (SRI).  A score of one to eight results in a recommendation to increase the security level.  *Id*.  "An override of the SRI 'Points System' was not utilized on the form."[8]  McMahan Decl. ECF No. 13-13 at 2 at ¶ 10; ECF No. 13-15 (NBCI Institutional Bulletin #02-14, Maximum Security); ECF No. 13-21 (SRI).  Plaintiff was interviewed the same day, July 6, 2016, advised of the recommendation to increase his security level, and the recommendation was sent to Mr. Roderick for review.  McMahan Decl. ECF No. 13-13 at 2 at ¶ 11.  On July 7, 2016, Mr. Roderick, in his role as Case Management Manager, concurred with the recommendation and forwarded the SRI to Acting Warden Jeff Nines, who, on July 13, 2016, approved the recommendation to increase Plaintiff to Maximum Security Level II. McMahan Decl. ECF No. 13-13 at 2 at ¶¶ 11, 12, 13; Roderick Declaration, ECF No.  13-22 at 2 ¶ 10; ECF No. 13-21 (SRI).  Plaintiff was increased to Maximum Security Level II, and regular updates were provided to the NBCI Case Management Department about Plaintiff's activities with recommendations that he remain on administrative segregation.  Barnhart Decl. ECF No. 14-4 at 2 ¶ 10.  Defendants filed their dispositive motion on November 5, 2019; Plaintiff's next administrative segregation review was scheduled for later that month.  ECF No. 1; Barnhart Decl. ECF No. 13-4 at 2 ¶ 12; Roderick Decl. ECF No. 13-22 at 2 ¶ 11.

---

[8]   Case management can agree with the SRI recommendation or override it.  ECF No. 13-20 at 23 (DOC Manual, DOC.100.0002, Case Management, Security Classification).  Here, case management agreed with the results of the SRI and an override was unnecessary.

Plaintiff has received three infractions since his assignment to administrative segregation and increase to Maximum Security Level II.  Barnhart Decl. ECF No. 13-4 at 2 ¶ 11.  He was found guilty on September 12, 2017, of violating inmate rule #116 (possession, misuse, tampering with, or destroying security devices, equipment, property, or detection or monitoring equipment). On February 27, 2018, he was found guilty of violating rules #104 (making threats), #312 (interfering with or resisting a search), #400 (disobeying a direct, lawful order), and #405 (any exhibition, demonstration, or conveyance of insolence, disrespect, or vulgar language).  He was found guilty of violating inmate institutional rules #105 (possession, use, or manufacturing of a weapon), and #308 (stealing state property) on June 25, 2019.  *See* ECF No. 13-24 (Notices of Infraction); ECF No. 13-5 at 1 (listing infractions).

Plaintiff remains at Maximum Security Level II; however, on September 18, 2019, he was removed from both Administrative and Disciplinary Segregation.  Barnhart Decl. ECF No. 13-4 at 2 ¶ 12; Roderick Decl. ECF No. 13-22 at 2 ¶ 12; ECF No. 13-18; ECF No. 13-19 at 1.  Yearly reviews of Plaintiff's security level were conducted on November 17, 2017, and November 14, 2018.  McMahan Decl. ECF No. 13-13 at 2 at ¶ 14.

On June 30, 2016, Plaintiff filed an administrative remedy procedure (ARP) request (ARP NBCI-1504-16) complaining that Lt. Barnhart placed him on administrative segregation pending investigation on June 2, 2016.  ECF No. 13-26 at 1.  On July 6, 2016, the ARP was dismissed on the ground that inmates may not seek relief from case management recommendations and decisions through the ARP process.  *Id.*

On August 12, 2016, Plaintiff filed a grievance (IGO No. 20161451) with the Inmate Grievance Office ("IGO"), alleging that his July 6, 2016, increase to Maximum II was arbitrary.

Declaration of Samiyah G. Hassan, ECF No. 13-27 at 1; 2-8.  The IGO dismissed the grievance for failure to state a claim and lack of merit.  ECF No. 13-27 at 15.

On October 28, 2016, Plaintiff filed a Petition for Judicial Review in the Circuit Court for Allegany County, *In the Matter of Kernell Williams*, case 01-C-16-044762.  ECF No. 13-28 (Maryland Judiciary case search printout).  On April 7, 2017, the Circuit Court remanded the case to the IGO for referral to the Office of Administrative Hearings (OAH), for a hearing on the merits of the grievance.  ECF No. 13-27 at 28, 37-40.

On December 6, 2017, Administrative Law Judge ("ALJ") Stuart Breslow conducted a hearing on the grievance.  Plaintiff represented himself and testified on his own behalf.  ECF No. 13-27 at 56, 57.  At issue was whether the decision to increase Plaintiff's security level to Maximum II on July 6, 2016, was arbitrary and capricious or inconsistent with the law.  *Id.* at 56. In a Decision and Order dated February 22, 2018, the ALJ noted that an SRI score of eight or less supported a security level classification increase.  Plaintiff's SRI score was six, and he did not challenge the results of the SRI in his grievance.  ECF No. 13-26 at 61; *see also* ECF No. 13-27 at 2-8 (IGO grievance).   The ALJ rejected for lack of evidence Plaintiff's argument that his reclassification to a higher security level was a punishment and violated COMAR 12.02.08.02.F.[9] The ALJ credited Lt. Barnhart's memorandum that the reclassification was to house Plaintiff "as safely as possible for the overall safety and security of NBCI staff and inmates" and the "not a

---

[9]   This regulation provides that the assignment of an inmate to a security level is based on three principles:

(1) An inmate is assigned to the appropriate security level necessary to control the inmate's behavior;
(2) Security may not be increased as a means of punishment; and
(3) Assignment of a security level is based on objective behavior-oriented factors.

COMAR 12.02,08,02.F; *see also* ECF No. 13-27 at 61.

punishment, but rather was made based on the results of the Instrument." ECF No. 13-27 at 61. Thus, the ALJ concluded the decision to increase Plaintiff's security classification was not arbitrary and capricious, or inconsistent with the law, complied with state agency regulations, and Plaintiff was "not constitutionally entitled to any due process regarding his classification because no liberty interest, state created or otherwise, existed." ECF No. 13-27 at 55-66. Having so concluded, the ALJ denied and dismissed the grievance as without merit. *Id*. at 66.

Lt. Barnhart, Case Manager McMahan, and Case Management Manager Roderick deny making false statements or preparing false documents about Plaintiff or any other inmate, and deny witnessing, or having knowledge of any other NBCI staff member doing so. Barnhart Decl. ECF No. 13-4 1 at ¶ 13, McMahan Decl. ECF No. 13-13 at 2 ¶ 15, Roderick Decl. ECF No. 13-22 at 2 ¶ 13. Further, they state that they have never intentionally, or to the best of their knowledge, ever violated DCD-50-2,"Standards of Conduct and Internal Administrative Disciplinary Process," or been disciplined for any violation of that policy. Barnhart Decl. ECF No. 13-4 at 3 ¶ 14, McMahan Decl. ECF No. 13-13 at 2-3 ¶ 16, Roderick Decl. ECF No. 13-22 at 2 ¶ 14); *see also* ECF No. 25 (DCD #50-2).

## II.      Standard of Review

The purpose of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the complaint. *See Edwards v. Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). The Supreme Court articulated the proper framework for analysis:

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (abrogated on other grounds). While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, *ibid.*; *Sanjuan v. American Board of Psychiatry and Neurology, Inc*., 40 F.3d 247, 251 (7th Cir. 1994), a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions,

11

and a formulaic recitation of the elements of a cause of action will not do, *see Papasan v. Allain*, 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235 236 (3d ed. 2004) (hereinafter Wright & Miller) ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"), on the assumption that all the allegations in the complaint are true (even if doubtful in fact), *see, e.g., Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508, n.1 (2002); *Neitzke v. Williams*, 490 U.S. 319, 327(1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) (a well pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely").

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (footnotes omitted).

This standard does not require a defendant to establish "beyond doubt" that a plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Id.* at 561. Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. *Id*. at 562. The court need not, however, accept unsupported legal allegations, *see Revene v. Charles Cty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *see Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *see United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of showing that there is no genuine issue as to any material fact. However, no genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *Celotex*, 477 U.S. at 322-23. Therefore, on those issues on which

12

the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure when there is no genuine issue as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law. In *Anderson v. Liberty Lobby, Inc*., the Supreme Court explained that, in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." 477 U.S. at 249 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id*. at 252.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in a light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)); *see also E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005). The mere existence of a "scintilla" of evidence in support of the non-moving party's case is not sufficient to preclude an order granting summary judgment. *See Anderson*, 477 U.S. at 252. This court has previously held that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citation omitted).

13

## III. Discussion

### A.        Warden Frank B. Bishop

To establish liability in a § 1983 case, a plaintiff must show that a defendant was personally involved in the alleged deprivation of his constitutional rights, *Vinnedge v. Gibbs,* 550 F.2d 926, 928–29 (4th Cir. 1977), or establish a defendant's liability as a supervisor, *see Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).  Supervisory liability may attach under § 1983 if (1) a defendant had actual or constructive knowledge that a subordinate was engaged in conduct that posed a pervasive risk of a constitutional injury; (2) a defendant's response to that knowledge was so inadequate as to show deliberate inference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between defendant's inaction and the alleged constitutional injury. *Shaw,* 13 F.3d at 799.

The Complaint sets forth no allegations that Warden Bishop was personally involved in the matters at issue, or had actual or constructive knowledge to confer supervisory liability. Plaintiff alleges instead that Bishop is NBCI's "highest authority" responsible for oversight of the facility and is the "final appellate authority over inmate institutional grievances and concerns." ECF No. 1 at 2.  Plaintiff argues in his opposition that final decisions about security classifications are made by the Warden or a designee.  ECF No. 19 at 5.  In this case, Assistant Warden Jeff Nines concurred with the case management decision.  *See supra* p. 7.  Warden Bishop did not participate in the decision.  The complaint alleges insufficient facts to show personal participation by Warden Bishop or to premise a supervisory liability claim.  The complaint fails to state a claim against Warden Bishop, and he will be dismissed from this case.

**B.  Defendants Barnhart, Roderick, and McMahan**

    **1.       Due Process Claims**

The Fourteenth Amendment's Due Process Clause guarantees that no state shall "deprive any person of ... liberty ... without due process of law."  To bring a due process claim, a plaintiff must first show the existence of a protected property or liberty interest.  *Mathews v Eldridge*, 424 U.S. 319, 332 (1976); *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).  "[T]he Supreme Court has long recognized that a prisoner may have a state-created liberty interest in certain prison confinement conditions...."  *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015).  Imprisonment is a deprivation of a liberty interest, but it is constitutional, provided that the conviction is valid and "the conditions of confinement do not otherwise violate the Constitution."  *Meachum v. Fano,* 427 U.S. 215, 224 (1976), *see also Sandin v. Conner,* 515 U.S. 472 (1995) (requiring an atypical and significant hardship as prerequisite to creation of a constitutionally protected liberty interest).

Although prisoners are entitled to due process when sanctions could affect the overall duration of the prisoner's sentence, a prisoner does not have a right to due process before placement in a more restrictive housing placement unless the conditions impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin v. Conner*, 515 U.S. 472, 484 (1995) (citing *Wolff v. McDonnell*, 418 U.S. 539); *Wilkinson v. Austin*, 545 U.S. 209, 210 (2005).  Whether confinement conditions are atypical and substantially harsh "in relation to the ordinary incidents of prison life" is a "necessarily . . . . fact specific" comparative exercise.  *Beverati v. Smith*, 120 F.3d 500, 502-03 (4th Cir. 1997) (quoting *Sandin*, 515 U.S. at 483-84); *accord Ramirez v. Galaza*, 334 F.3d 850, 861 (9th Cir. 2003) ("There is no single standard for determining whether a prison hardship is atypical and significant, and the condition or combination of conditions or factors . . . . requires case by case, fact by fact consideration."

(alteration in original) (internal quotation marks omitted)).  Harsh or atypical prison conditions in and of themselves do not provide the basis of a liberty interest giving rise to Due Process protection.  *Prieto v Clarke*, 780 F.3d 245, 250 (4th Cir. 2015).  Rather, there must exist an interest in avoiding "erroneous placement [in the challenged confinement] under the state's classification regulations *combined with* . . . . harsh and atypical conditions" for Due Process protections to apply.  *Id.* (emphasis in original) (citing *Wilkinson* 545 U.S. at 224-25).

Assignment to administrative segregation ordinarily does not create an atypical and significant hardship.  *See Hewitt v. Helms*, 459 U.S. 460, 467 (1983) (holding that administrative segregation is part of the ordinary incidents of prison life.  Inmates generally have no liberty interest in obtaining a particular security classification *Slezak v. Evatt*, 21 F.3d 590, 594 (4th. Cir. 1994).  There is no constitutional right for an inmate to be housed in a particular institution, at particular custody level, or in a particular portion or unit of a correctional institution.  *See Sandin*, 515 U.S. 472, 484 (1995); *See Meachum*, 427 U.S. at 224 (Prisoners do not have a right to due process in their housing assignments).

### a.      Administrative Segregation

Plaintiff claims that Defendants arbitrarily placed him on administrative segregation in violation of his right to substantive due process (Claim 3), administrative segregation subjected him to an atypical and significant hardship (Claim 5), and he was not provided monthly segregation reviews which violates his right to procedural due process (Claim 6).

Plaintiff does not allege in the Complaint what conditions on administrative segregation were atypical and posed significant hardship to trigger due process protections.  In his opposition, he states that he is confined to a cell for twenty-three hours a day, is allowed only three fifteen minute showers each week, and is permitted outside recreation at night in a one person "cage,"

and cannot attend congregate religious services.   ECF No. 19 at 3.   He implies that his administrative segregation was indefinite.  *Id.* at 8.  Plaintiff has provided a declaration from fellow inmate Tracy Skinner, who is assigned a cell next to his.  Skinner states that from October 2018 to May 29, 2019 he witnessed Plaintiff escorted only once to a monthly administrative segregation review.  ECF No. 19-8.

It is not atypical for inmates to be placed on administrative segregation pending an investigation or for monitoring in light of safety concerns.  *Beverati*, 120 F.3d at 502 (finding no liberty interest where plaintiffs were confined to administrative segregation based on prison official's belief that they posed a danger to institutional security ); *McKune v. Lile*, 536 U.S. 24, 26 (2002) (stating that the "decision where to house inmates is at the core of prison administrators' expertise").   Division of Correction Manual ("DOC") 100.002 provides that an inmate may be placed on administrative segregation in response to "a potential threat to the safety, security, and good order of the facility, and when there is a reason to believe the placement of an inmate on administrative segregation will reduce that threat."   ECF No. 13-14 at 2.   Once assigned to administrative segregation, the placement must be reviewed by case management at least once every 30 days.  *Id.* at 4.[10]

Importantly, the record evidence shows that Plaintiff was provided procedural protections including timely notice of his assignment to administrative segregation, review by a three member panel and regular monthly reviews thereafter.   His removal from administrative segregation in 2019 belies his claim of indefinite placement.   Viewing Plaintiff's allegations in the light most

---

[10]    If an inmate refuses to appear before the case management team, he shall sign a waiver to indicate his refusal, which must be signed and witnessed by a staff member.  If the inmate refuses to appear and sign the waiver, two staff members must witness the refusal to sign.  No copies of the waiver were provided by Defendants.  *See supra* n. 6.

favorable to him, missing several review monthly review meetings (although Plaintiff does not identify which meeting(s) he missed), occasional absences as he seems to allege here are insufficient to amount to a constitutional violation.  To the extent that he alleges that his absence from segregation review meetings abridge DOC directives, a violation of prison policy alone does not state a Fourteenth Amendment due process violation.  *See Myers v. Klevenhagen*, 97 F.3d 91, 94 (5th Cir. 1996); *Kitchen v. Ickes*, 116 F. Supp. 3d 613, 629 & n.6 (D. Md. 2015) (citing *Myers*). Additionally, Defendants have provided  ample evidence of his disciplinary infractions, validated gang affiliation, and the discovery of homemade weapons to warrant closer monitoring of his activities.  *See Superintendent, Massachusetts Correctional Institution v. Hill* 472 U.S. 445, 455 (1985) (in prison disciplinary proceeding involving loss of diminution credits, substantive due process is satisfied if the decision is based on "some evidence."); *Tyler v. Hooks*, 945 F. 3d 159, 171 (4th Cir. 2019) (noting standard presents a low burden for prison official to meet). Accordingly, the court finds that there is no genuine issue as to any material fact in dispute to support as to Plaintiff's claims his assignment to administrative segregation violated his due process rights. Defendants' motion for summary judgment will be granted as to these claims.

### b.    Security Classification

Plaintiff claims his due process rights were violated by Lt. Barnhart's recommendation for an "out-of-cycle" review and override of the point system in violation of his constitutional rights (claim 1), Case Manager McMahan arbitrarily held an out of cycle security review and raised his security level (claim 2), Defendants made false statements and falsified documents to place him on administrative segregation indefinitely in violation of his right to due process and in violation of DCD 50-2 (claim 4) and the increase in his security level subjects him to an atypical and significant hardship (claim 5).

Correctional institutions need to maintain order and discipline, and matters of security classification are reserved to the sole discretion of prison officials. *See Slezak v. Evatt,* 21 F.3d 590, 594 (4th Cir. 1994). *Sandin,* 515 U.S. at 482 (stating that "federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment"). Notably, Plaintiff does not dispute his history of infractions involving weapons possession, manufacture, and assaults.

Lt. Barnhart's concerns, prompted by the discovery of homemade weapons at NBCI and the missing metal from the footlocker, clearly outlined the reasons for his request to review Plaintiff's security level.  Based on these reasons, Lt. Barnhart believed Plaintiff to be a violent inmate with the ability to obtain the materials needed to produce homemade weapons and the skills to convert these materials into deadly weapons.  The request for a security review was based on concerns for the safety and security of staff and inmates.  Case Manager McMahan conducted the security review in response to the serious safety concerns expressed in the memorandum.  Contrary to Plaintiff's assertions, there was no override of the SRI results.  An override was unnecessary because Plaintiff's total institutional score of 6 placed him squarely in the range for a security level increase.  ECF No. 13-21.  In his opposition, Plaintiff alleges that there was an override of the SRI from 19 to 6.  Review of the documents shows the score was 6 with Plaintiff's security assessment a separate score of 19.  ECF No. 13-21.  Plaintiff provides no evidence to show the scoring violated his right to due process or was improperly conducted.

Further, Plaintiff uses the term "out of cycle security review" without explanation.  The record provides no explanation otherwise.  The court takes note that DPSCS Information Bulletin #20-14 required case management staff to complete a security classification within 60 days of an inmate's arrival to NBCI to determine suitability for Maximum Level II placement.  ECF No. 13-

27 at 53.  The Bulletin however did not limit security reviews to this time period.  Importantly, Plaintiff does not explain how conducting a purportedly "out of cycle review" violated his right to due process.  Plaintiff identifies no constitutional provision that requires inmate security reviews be conducted only at particular times.

Plaintiff does not allege how his placement on Max II security posed an atypical and significant hardship.  Moreover, the record shows he has been, and continues to be, provided regular, yearly reviews of this status.  The court is unaware of any Maryland law or regulation conferring a liberty interest that has been violated here.  In the absence of a protected liberty interest Plaintiff cannot successfully claim that his due process rights were violated because [p]rocess is not an end in itself."  *Olim v. Wakinekona,* 461 U.S. 238, 250 (1983).

### c.       False Statements and Falsified Documents

Plaintiff alleges that Defendants made false statements and falsified documents in violation of his right to due process and DCD 50-2.[11]  It is not clear what information Plaintiff alleges is false or what records were purportedly falsified.  In his opposition, Plaintiff contends that Mr. Roderick falsely alleged that he is a member of a STG and used this information to place him in administrative segregation.  ECF No. 2-3.  Inmates have a limited constitutional right, grounded in the due process clause, "to have prejudicial erroneous information expunged from their prison files," and they are deprived of this right if prison officials refuse to expunge material after being requested to do so.  *See Paine v. Baker,* 595 F.2d 197, 202-03 (4th Cir. 1979).  However, "it is not sufficient that the inmate disputes evaluations and opinions regarding him" and federal courts will not "second-guess the[se] evaluations."  *Id.*  The erroneous information must have been relied on

---

[11]    *See* ECF No.13-25, Department of Public Safety and Correctional Services, DCD 50-2, Standard of Conduct and Internal Disciplinary Process.

"to a constitutionally significant degree" in order to state a claim. *Id*.[12]  Here the information relied on was based on Barnhart's opinion after he reviewed intelligence information, Plaintiff's infraction history, and the presence of homemade weapons in the institution, placing this information outside the purview of *Paine*.  In any event, Plaintiff does not assert that he requested expungement of this information, that he provided evidence to dispute his status as a validated STG member, or how this information was relied on to a constitutionally significant degree.

As to Plaintiff's claim that the provisions of DCD 50-2 have not been followed, Defendants Barnhart, Roderick, and McMahan state in their declarations that they have never intentionally or to the best of their knowledge ever violated DCD-50-2.  As earlier noted, a violation of prison policy alone does not state a Fourteenth Amendment due process violation.  Plaintiff has not been denied procedural or substantive due process.  Defendants will be granted summary judgment as to these claims.

### 2.    Equal Protection

To the extent Plaintiff intends to assert an equal protection claim for the first time in his opposition, he may not do so.  *See Mylan Labs., Inc. v. Akzo, N.V*., 770 F. Supp. 1053, 1068 (D. Md. 1991) (stating that "it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss" (citation omitted)); *see also Zachair Ltd. v Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint" (citations omitted)), aff'd 141 F.3d 1162 (4th. Cir. 1998).  Even if this were presented in the complaint, it is unavailing.

---

[12]   "If the information is relied on to deny parole or statutory good-time credits, or to revoke probation or parole, the inmate's conditional liberty interest is at stake and the due process clause is called into play."  *Paine* at 595 F.2d at 202.

To succeed on an equal protection claim based on his placement in administrative segregation, Plaintiff must prove that he was treated differently than other similarly situated inmates as a result of intentional discrimination and that his disparate treatment was not rationally related to any legitimate penological interest. *See King v. Rubenstein*, 825 F.3d 206, 220-21 (4th Cir. 2016). Plaintiff has not even alleged, much less established, that there are similarly situated inmates who were treated more favorably or that his treatment was unsupported by a rational basis. The equal protection claim is therefore not viable.

### 3.   Eighth Amendment

Construing Plaintiff's claims liberally, he may intend to assert that the decision to place him on administrative segregation constituted cruel and unusual punishment in violation of the Eighth Amendment. To succeed in an Eighth Amendment claim based on harsh conditions of confinement, a prisoner must show that "the deprivation of [a] basic human need was objectively sufficiently serious," and that "subjectively the officials acted with a sufficiently culpable state of mind." *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (emphasis in original) (citation omitted). Prison officials cannot be held liable for violating the Eighth Amendment unless they knew of, and then disregarded, an excessive risk to inmate health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *see also Wilson v. Seiter*, 501 U.S. at 294, 302–03 (1991) (applying the deliberate indifference standard to conditions of confinement claims); *Brown v. N.C. Dep't of Correction*, 612 F.3d 720, 723 (4th Cir. 2010) (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)).

Even viewing the evidence most favorable to Plaintiff he has not demonstrated that his placement in segregation amounted to cruel and unusual punishment to establish an Eighth Amendment violation. Further, he does not allege he suffered any injury or decline in health as a result of the conditions in administrative segregation. He provides no evidence from which a

reasonable factfinder could conclude that Defendants acted with deliberate indifference.  As earlier noted, the record shows ample cause for Defendants to take additional precaution in determining his housing.  Administrative segregation alone does not constitute an Eighth Amendment violation. *Wishon v. Gammon,* 978 F.2d 446, 449 (8th Cir. 1992)).  Accordingly, this claim is unavailing.

## IV.    Conclusion

For these reasons, the court will grant Defendants' motion to dismiss or in the alternative for summary judgment.  A separate order follows.


August 13, 2020                       _____/s/_____
                                      DEBORAH K. CHASANOW
                                      United States District Judge